UNITED STATES of America

v.

Morris C. GOLDBERG, etc., et al.

Civ. A. No. 35830.

United States District Court
E. D. Pennsylvania.

Sept. 14, 1967.

Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., John J. Gobel, Donald J. Gavin, Tax Div., Dept. of Justice, Washington, D. C., for plaintiff.

Richardson Dilworth, Louis E. Levinthal, Arthur E. Dennis, Philadelphia, Pa., for defendant Morris C. Goldberg.

Edwin P. Rome, Jack R. Bershad, Philadelphia, Pa., Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., of counsel, for receivers.

OPINION

CLARY, Chief Judge.

This action, instituted under the Internal Revenue Laws of the United States, started with an application for receivership of all of the personal assets of Morris C. Goldberg, sole owner of the Pennsylvania Laundry Company, as well as the numerous corporations which he had assembled into a vast laundry complex. The owner, under circumstances hereinafter related, was indicted, tried and convicted for Wilful Income Tax Evasion. The claims of the Government against the corporations exceeded three and one-half million dollars and the income taxes alleged to be due from Goldberg personally exceeded five million dollars.

The present problem is whether this Court has the right to enjoin Goldberg from engaging in competition with the Pennsylvania Laundry Company for a reasonable period of time after a Court directed sale of the physical assets of the company (plant equipment, etc.) and the good will of the company (routes, list of customers, trade secrets, etc.). The underlying facts of the case are as follows:

Morris C. Goldberg, sole owner of the Pennsylvania Laundry Company, was indicted in this Court under Indictment No. 20663 on Nine Counts, charging Wilful Evasion of Income Taxes. After a lengthy trial, he was convicted on Counts 2, 3, 4, 5, 7, 8 and 9 and sentenced on July 10, 1962 to 3½ years on Counts 2, 7 and 8 to run concurrently with each other, and to 3½ years on Counts 3, 4 and 9 to run concurrently with each other, but consecutive to the sentence under Counts 2, 7 and 8. On Count 5, he was given a suspended sentence

with 5 years probation to be calculated upon his release from imprisonment. In addition, he was fined $10,000. on Counts 2, 3, 4, 5, 7, 8 and 9, a total of $70,000.

The sentence was promptly appealed and after exhausting all appeal resources, the said Goldberg surrendered and started his sentence effective June 23, 1964. He served 2 years, 6 months and 6 days in the Federal Penitentiary at Lewisburg, Pennsylvania, and was paroled on November 28, 1966; the expiration of the parole to be June 22, 1971.

The vehicle through which Goldberg accomplished this wilful tax evasion was the Pennsylvania Laundry and its affiliated companies. All stock of the Pennsylvania Laundry was owned by Goldberg and is presently held by the Chase Manhattan Bank of New York under an agreement that the bank has the power to vote the stock and indeed has voted it and has elected a Board of Directors for the past few years.

On May 22, 1964, the United States, under the provisions of Section 7403(d) of the Internal Revenue Code filed the present suit in this Court against Goldberg and affiliated companies, asking for a Receiver to take over all of the assets of Goldberg, as well as corporate assets, for the purpose of extinguishing the tax liability of Goldberg and of his companies to the United States. Receivers were appointed June 8, 1964.

Because of involvement with a South Carolina operation, known as Goldtex, wherein the Pennsylvania Laundry Company was a signator to a mortgage of some $650,000. and on which foreclosure proceedings had been instituted, it was impossible for the Receivers who took charge of the businesses to accomplish more than a continued operation of the business. It soon became clear after several months that it was necessary, since Goldberg vehemently denied the tax amount of the lien, for the Court to appoint a tax counsel and tax attorney to negotiate with the Government the tax liability of the Pennsylvania companies. After extended work by these appointees which lasted for a period of almost one year, the tax liabilities of the companies were set at one million, four hundred thousand dollars, and a judgment for that amount was entered against the companies. In the meantime, because of a change in economic factors in the denim business, the Receivers were able to extinguish the mortgage in the Goldtex matter amounting to some $650,-000., the lien of which preceded that of the Government for income taxes. This accomplishment of the Receivers was indeed outstanding in that up until a few weeks before the negotiation of this very advantageous sale, the highest price that could be obtained for the South Carolina plant was in the range of $250,000. to $300,000. Had the foreclosure been effected in ordinary course, all of the assets of the Pennsylvania Laundry would have been sold to satisfy the deficiency judgment. In other words, the Trustees have preserved the most important assets of the Pennsylvania Laundry consisting not only of plant equipment but also much more importantly the "good will" of the company consisting of routes, lists of customers, trade secrets, etc., which are the life's blood of the laundry business.

On June 28, 1966, this Court, after conference with the Trustees, directed them to prepare brochures and solicit bids for the purchase of the properties. At one time there was a very substantial offer accompanied by a check offering to purchase part of the Goldberg laundry complex consisting of routes, way-stations, etc. in the State of Pennsylvania. Because of the fears of the Government, through the Assistant Attorney General and the attorneys for the Chase Manhattan Bank and a principal creditor whose combined claims against the corporations are about $900,000. that the sale of part might derogate against a more advantageous sale of the whole, the Receivers reluctantly returned the deposit and negotiations were terminated.

Complying with the Order of the Court, the Receivers had prepared a brochure and circulated it among all of the in-

dividuals and corporations of the United States, whom they felt had the necessary resources to purchase and operate the business. Shortly thereafter Goldberg was released from jail. To this date not one meaningful offer, other than as above outlined, has been received from any source. It became evident as time went by that Goldberg was attempting to obtain finances to reacquire these businesses. It also became apparent that the reason no meaningful offer had been received was the fear that once the properties had been purchased, the purchaser would be subjected to "raiding" by Goldberg, who personally is one of the outstanding laundry operators in the entire United States.

The record of the hearings, all of which have been transcribed, indicates that these fears were justified. Goldberg's activities in the past in acquiring routes by rather unpleasant and devious procedures was well known to the trade and prospective purchasers and they refused to make any bid with this "Sword of Damocles" hanging over their heads. In fact, one well-known Philadelphian visited this office and asked where he should submit a bid and with whom should he negotiate. He volunteered that the people he was speaking for had sufficient capital to "swing the deal" but that they were not interested in and would not submit any bid if Goldberg were allowed to compete with them. The gentleman was advised that the Court was not interested in receiving any bids or hearing any statements concerning prospective purchasers and referred him to the Receivers for any negotiations he might have in mind. Inquiry of the Receivers reveals that no such approach was made.

The Court has been fully apprized of all proceedings in this case. As a matter of fact, the Receivers and counsel for the Receivers have held conferences at least once every two weeks during the progress of this litigation. The Receivers have informed the Court of the activities of Mr. Goldberg in his attempt to regain control of his properties, and

his counsel, Richardson Dilworth, Esquire, and Judge Louis E. Levinthal have frankly stated to the Court the source from which he was attempting to get the fund—The Teamsters' Pension Fund.

To the fullest extent possible, Mr. Goldberg's attorneys have been furnished with data which would enable any lending institution to make a full appraisal of the situation. As time went on, it became increasingly evident to the Court that with Mr. Goldberg in the picture, no meaningful offer would ever be received for the assets of this company. In other words, the whole matter was on dead center. The Receivers not only operated the plant but actually increased the business of the company, but they were limited in what they could do because of lack of working capital. The Court thereupon called a meeting of the Receivers, their counsel, and attorneys for Goldberg and the Bank, and advised them that the Court would issue on its own motion a Rule to Show Cause why the Receivers should not sell the properties with a restrictive covenant restraining Morris C. Goldberg, directly or indirectly, from competing for a period of three years, with the purchasers of such assets, in the same categories of the commercial laundry business now being conducted by the Pennsylvania Laundry Companies, and put of record at the hearing held in chambers on June 21, 1967 its reason therefor.

Pursuant thereto, a Rule to Show Cause was issued on the 14th day of July, 1967, directed to the United States, Morris C. Goldberg, and all other parties in interest, to show cause why such an Order should not be issued. Hearing was set for Friday, August 4, 1967, and was held in due course.

During the hearing, it became evident that the use of the words "restrictive covenant" was improper. The Court informed Judge Levinthal, counsel for Goldberg, that the intention of the Rule was to show cause why this Court should not enter an Order restraining Goldberg personally, directly or indirectly, from competing with the purchasers of the

assets. Judge Levinthal stated he understood that to be the intention of the Court. At the bar of the Court, Judge Levinthal submitted a written motion to dismiss the Rule and a memorandum of law in support of his said motion, based primarily on the grounds that such an injunction would be unwarranted, improper and legally invalid. He conceded that good will in bankruptcy constitutes property in the hands of a bankrupt owner, citing Collier on Bankruptcy. Fundamentally, however, he depended upon the reasoning of Beauchamp v. United States, 76 F.2d 663 (9 Cir. 1935). He pointed up further that the Court there decided that the appellant was under no contractual obligation to refrain from soliciting customers of the former business of which he was an agent and that the right to use his own name in earning a livelihood should not be taken away. He cites also the opinion of Judge Learned Hand in Mutual Life Insurance Co. v. Menin, 115 F.2d 975 (2 Cir. 1940), cert. denied, 313 U.S. 578, 61 S.Ct. 1096, 85 L.Ed. 1536 (1940) as analogous and supporting his position. He argued further that in the case of an involuntary sale of good will, the vendor in invitum is not subject to so heavy a disability as in the case of a voluntary sale.

Counsel for the Receivers have filed answering Memorandum, which is more persuasive. They pointed out that the evidence produced at the hearing shows that in this particular industry, no one sale has been made which did not include a restrictive covenant not to compete for a period of time. Probably the most experienced counsel, who has represented more people in the laundry industry in Philadelphia than any other attorney for the past forty years, the Honorable Harry Shapiro, testified at the hearing that it was impossible to make a desirable sale without the restrictive covenant. He was supported by another attorney, Herbert Mayers, Esquire, who has represented clients in that industry for over thirty years. In addition, the President-General Manager of the Company for the Receivers, Barry Wolman, testified that the records of the company indicate that in every acquisition of routes of any laundry business, Mr. Goldberg himself insisted upon a restrictive covenant.

The Court finds as a fact that this property has a minimal value if it is to be subjected to the competition of Morris C. Goldberg, defendant. As stated by the Government in its brief, in view of the standard practice in the industry and the apparent concern of prospective purchasers about possible future interference from Goldberg, it is obvious that some restriction upon him is necessary here. I agree with the Government that it would truly be an anomaly if this Court and the Government were precluded from obtaining a realistic and meaningful price for the corporate assets because Goldberg was left free to use his knowledge of the operations and customers to later undercut the value of the assets purchased. The Government thus takes the position that the Court should enjoin the defendant Goldberg, for a reasonable period of time after a sale, from in any way interfering with the assets sold, including the customers, good will, trade secrets, etc. In support thereof, the Government cites the leading case of Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957). In support thereof, the Government also cites the cases of Mutual Life Insurance Co. v. Menin, supra; E. Edelman & Company v. Fredericks Armature Mfg. Co., 3 F.Supp. 973 (M.D.Pa.1933); S. F. Myers Company v. Tuttle, 188 F. 532 (C.C.S.D.N.Y.1911) and cf. Summe v. Chapman Dairy Company, 238 F.2d 3 (8 Cir. 1956) and Merry Hull & Company v. Hi-Line Company, 243 F.Supp. 45 (S.D.N.Y.1965).

The laundry industry is a highly competitive industry and antitrust actions against individuals, corporations and trade associations have been prosecuted successfully by the United States in this Court and in the Southern District of New York. Recognizing the peculiar characteristics of the business in the decrees entered in each case, the Govern-

ment permitted any of the companies, which either would thereafter sell or acquire businesses in the same line of commerce, to include the type of restrictive covenant above referred to, without being in violation of the injunctions entered in each case. The Government and the industry recognized that without such covenant, there would be little or no value in the sale of a particular business. As set out above, the names of the customers, the established routes which are served daily or weekly by the same supplier, are the real value of the business. As a matter of fact, the value of a particular route is based upon generally the dollar value per week of the route times a certain number of dollars, which may average from $45.00 to $65.00, depending upon the state of the market. It will thus be seen that interference of business relations with customers on a particular route by a person such as Goldberg, who knowing the customers, would unquestionably solicit them and probably cut prices, would not only diminish the value of the assets in a very marked degree, but might make the assets worth only "Junk Value".

As above referred to, Goldberg has attempted to reacquire the property by raising funds to bid for the assets. To permit him to depreciate the value of the assets by warning off otherwise willing and competent bidders, and permitting him to reacquire the very assets he used to defraud the Government and reduce the amount the Government might realize in taxes, would result in a situation completely shocking to this Court and a situation which this Court in good conscience cannot possibly permit.

The Court has the obligation to see that the United States gets the highest return possible from the sale of these assets and the Court finds no reason, either in law or logic, why it should not act forthrightly in bringing about the best possible result for the Government. The restriction will be for a reasonable time (3 to 5 years) and will not preclude Goldberg from thereafter entering the business, if he so desires. Nor will it deny him the privilege of engaging in other facets of the laundry industry outside of the scope of the Pennsylvania Laundry operation. There will be nothing in the Order which will prevent Goldberg, or his associates, from offering a fair market value for the assets as and when offered for sale by the Receivers under separate Order to be entered later.

The foregoing will constitute the Findings of Fact and Conclusions of Law consistent with the appropriate Federal Rules of Civil Procedure.